# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KELLY M. GRIFFITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-862-SLR |
| | ) |
| MICHAEL ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

Katherine V. Jackson, Esquire, Gary William Lipkin, Esquire and Matt Neiderman, Esquire of Duane Morris LLP, Wilmington, Delaware. Counsel for Plaintiff.

Charles M. Oberly III, Esquire, United States Attorney, District of Delaware, and Dina White Griffin, Esquire, Special Assistant United States Attorney, District of Delaware, Counsel for Defendant. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, and Shawn C. Carver, Assistant Regional Counsel of the Office of General Counsel, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

Dated: March 20, 2012
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Kelly M. Griffith ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying her application for Supplemental Security Income benefits ("SSI") under Title XVI of the of the Social Security Act, 42 U.S.C. §§ 401-433.[1]  Plaintiff has filed a motion for summary judgment asking the court to award SSI. (D.I. 12)  Defendant has filed a cross-motion for summary judgment, requesting the court to affirm his decision and enter judgment in his favor. (D.I. 17)  The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[2]

## II. BACKGROUND

### A. Procedural History

Plaintiff filed a claim for SSI on April 10, 2006, alleging disability beginning on March 28, 2006, when plaintiff was 33 years old. (D.I. 10 at 72-77)  Plaintiff's initial application was denied on September 16, 2006 and upon her request for reconsideration on June 29, 2007. (*Id.* at 49-54, 59-61)  Plaintiff requested a hearing,

---

[1]SSI is available without respect to being insured for benefits, so long as an individual is disabled, and other criteria are met.  20 C.F.R. § 416.202.

[2] Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

which took place before an administrative law judge ("ALJ") on April 1, 2008. (*Id.* at 14-33) After hearing testimony from plaintiff[3] and a vocational expert ("VE"), the ALJ decided on July 17, 2008 that plaintiff is not disabled within the meaning of the Social Security Act, specifically, that plaintiff can perform other work that exists in the national economy. (*Id.* at 33) Plaintiff's subsequent request for review by the Appeals Council was denied. (*Id.* at 5-8) On October 8, 2010, plaintiff brought the current action for review of the final decision denying plaintiff SSI. (D.I. 1)

## B. Plaintiff's Non-Medical History

Plaintiff was born August 12, 1973 and is currently 39 years old. She has a high school education and past work experience as a waitress, bartender and gas station attendant. (D.I. 10 at 830, 853) She is currently married, and has no children. (*Id.* at 829)

Plaintiff has several medical conditions, which will be discussed in further detail in the context of her medical history, *infra*. She was also involved in an auto accident (as a restrained, front-seat passenger) in a collision on April 16, 2003. (*Id.* at 832) Plaintiff was knocked through the windshield of the SUV she was traveling in by a toolbox that flew from the back seat and hit plaintiff upon impact, whereupon plaintiff required 32 sutures, and also hit her right knee in the accident. (*Id.* at 20, 185) Plaintiff has not worked since the 2003 accident due to pain. (*Id.* at 185)

## C. Medical Evidence

The record at bar consists of over 800 pages of medical evidence, and the court

_____

[3]By video conference.

2

focuses only on the evidence emphasized by the parties in their moving papers.

### 1. Evidence pre-dating the alleged onset

Plaintiff's application for SSI (dated April 10, 2006) alleged disability beginning March 28, 2006. The court briefly reviews plaintiff's medical evidence pre-dating March 28, 2006 for background purposes. In 2002, when plaintiff was 29 years old, she was admitted to Christiana Care Health Services which noted a history of "kidney stones, pyelonephritis[4] and osteoarthritis." (D.I. 10 at 145) A past history was also noted of "congenital short uterers with decreased function of the left kidney, [and] frequent headache." (Id.) Vinod Kripalu, M.D. noted that plaintiff was admitted for likely pyelonephrisis given her symptoms of nausea, back pain and positive urinalysis, and that x-rays were taken, revealing "moderate osteoarthritis of the symphysis pubis and possible early osteoarthritis changes of the left hip joint." (Id. at 146) He also noted that the x-rays revealed "mild osteopenia,"[5] which given plaintiff's age, was "unusual," and that her right kidney was atrophied. (Id.) Rheumatologist Russell Labowitz, M.D. ("Labowitz"), treated plaintiff in the 1980s for arthritic problems. (Id. at 20) Specifically, Labowitz noted in 1988 that he did not suspect rheumatoid arthritis, rather, possible spondyl-arthropathy. (Id. at 187)

Edward Dale LaTonn, M.D. ("LaTonn") was plaintiff's pediatrician and continued to treat plaintiff through adulthood. LaTonn prescribed Vicodin (a narcotic) and Soma (a muscle relaxant) on January 16, 2003 for plaintiff's "arthritic symptoms." (Id. at 463)

---

[4]A urinary tract infection that has reached the kidney.

[5]Low bone marrow density, the bone loss being less severe than osteoporosis.

3

Plaintiff was admitted to the hospital from June 7-9, 2003 for a urinary tract infection (and related pain and nausea), and followed up thereafter with LaTonn. (*Id.* at 150, 461) Plaintiff was again admitted to the hospital with complaints of vomiting and "kidney pain" from July 21-22, 2003; she was discharged with recommendations to continue taking OxyContin (oxycodone, a narcotic) for pain, to see a urologist and follow up with LaTonn. It was also noted that a CT scan taken in June demonstrated "no evidence of obstructive uropathy or pyelonephritis but showed [an] atrophic right kidney with parenchymal calcifications and a hypertrophic [enlarged] left kidney with no evidence of calculi [mineral deposits]." (*Id.* at 174)

Labowitz evaluated plaintiff in September 2003 at LaTonn's request. Labowitz noted that plaintiff had complaints of pain in her knees, shoulders, low back, and hips. (*Id.* at 185) On examination, plaintiff had a full range of motion on all joints tested. (*Id.* at 186) Examination of her cervical and dorsal spine was normal except for some tenderness; plaintiff had no spasm, good lateral bending and a normal gait. (*Id.* at 186) Labowitz recommended continuing OxyContin but reduced to 20 mgs twice a day. He concluded that, while plaintiff has a history of rheumatoid arthritis, "on physical examination there is very little evidence of active synovitis, nor are there any deformities suggesting chronic rheumatoid disease. . . [She] may have lumbar spondylosis based on her description, but I would like to review [ ] xrays." (*Id.*)

Plaintiff followed up with LaTonn through August 2004 for checkups and prescription refills.[6] (*Id.* at 458-61) Plaintiff was admitted to the hospital on September

_____

[6]The majority of LaTonn's treatment notes are illegible. It is defendant's position that plaintiff's pre-onset date records are of little relevance, but does not specifically

4

1, 2004 and again on December 9, 2004 with similar symptoms (nausea, left-sided back and flank pain). (*Id.* at 192, 215-19) Plaintiff followed up with LaTonn regularly and through March 2005, during which time plaintiff was prescribed Restoril (for sleep), OxyContin, and Xanax (an anxiety drug). (*Id.* at 454-55)

Plaintiff treated with LaTonn on April 11, 2005 after falling down the steps onto her buttocks, at which time her medications were refilled. (*Id.* at 454) Plaintiff was evaluated at the hospital on April 19, 2005 after another fall down her basement steps, and was discharged with OxyContin and Predisone (for inflammation) upon findings of limited range of motion and lower extremity swelling. (*Id.* at 320-21, 328) Altogether, plaintiff was examined in the hospital for flank pain on March 6, 2004, March 9, 2005, March 29, 2005, March 31, 2005, twice in April as discussed above, May 17, 2005, June 9, 2005, and June 24, 2005. (*Id.* at 415-19, 395-400, 370-75, 349-54, 308, 292-96, 279-83) Narcotic pain medications were prescribed consistently.[7] (*Id.*)

Plaintiff was brought to the emergency room on July 11, 2005 after threatening to kill herself.[8] (*Id.* at 260) Plaintiff was seen in the hospital on August 6, 2005 for

_____

dispute plaintiff's characterizations of their contents.

[7]The Emergency Physician Record from the May 2005 visit indicated: "This hs [plaintiff's] 7[th] visit since March. Each visit was Rx'd OxyContin, Hydrocodone or Percocet [other narcotics]." (D.I. 10 at 308)

[8]The Emergency Physician Record states both that plaintiff experienced an "intentional drug overdose" and threatened herself with a knife; past drug abuse is also noted. (D.I. 10 at 260) Insofar as plaintiff's mental health is not a subject of the present appeal, the court does not discuss it further, except as her prescriptions may be relevant to other physical ailments.

5

vomiting[9] and on August 17, 2005 after falling on her left knee. (*Id.* at 244-49, 226) OxyContin was prescribed each time. (*Id.*) Plaintiff was seen in the emergency room on January 6, 2006 for an intentional drug overdose, whereby plaintiff ingested 120 oxycodone pills.[10] (*Id.* at 714-19) Treatment records indicate that plaintiff was consistently seen by LaTonn between January and April 2006, during which time OxyContin was prescribed. (*Id.* at 448-49)

## 2. Evidence post-dating the alleged onset

As noted above, plaintiff alleged (on April 10, 2006) that her disability began on March 28, 2006. Plaintiff treated consistently with LaTonn from April 2006 through September 2006; LaTonn refilled her prescriptions. (*Id.* at 445-47) During this period, plaintiff was seen in the emergency room on July 12, 2006 after having a seizure. (*Id.* at 627-28) Hospital notes list a history of seizure disorder since childhood with the last seizure 3 months prior to the incident.[11] (*Id.*)

State agency physician consultant Dr. V. K. Kataria ("Kataria") prepared a "Physical Residual Capacity Assessment" on September 12, 2006 after interviewing plaintiff and reviewing the administrative record. Kataria noted that plaintiff was observed walking through the parking lot without a cane, but then came to her interview

_____

[9]A treatment note indicates that plaintiff's speech was slurred and incomprehensible for a time during her stay. (D.I. 10 at 248)

[10]Plaintiff told hospital staff that she was not trying to kill herself, and that she took that amount because she had a tolerance to the drug. (D.I. 10 at 716)

[11]The ALJ, presumably having more experience with doctors' records than the court, read LaTonn's notes as indicating that, on March 9, 2006, plaintiff had been seizure-free for six months while treating with Phenobarbitol, which dosage was raised on July 18, 2006. (D.I. 10 at 22)

6

with a cane. (*Id.* at 438) Kataria noted that the cane was not prescribed by LaTonn.[12] (*Id.* at 439) On examination, Kataria noted a normal range of motion for plaintiff's extremities and a steady gait. (*Id.* at 439) It was Kataria's opinion that plaintiff retained the functional capacity to: occasionally lift or carry 20 lbs.; frequently lift or carry 10 lbs., stand or walk about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and push or pull with no additional limitations than the weight limits described above. (*Id.* at 438) Kataria deemed plaintiff only "partially credible" based on a "lack of objective findings." (*Id.* at 439) A "light RFC" was noted. (*Id.*)

Plaintiff was admitted to the hospital on September 19, 2006 for left flank pain as well as lightheadedness and dizziness, She was discharged with prescriptions for OxyContin, Levaquin (for infections), Dilaudid (for pain), and Xanax and told to continue Phenobarbitol. (*Id.* at 574-75) Plaintiff was seen in the emergency room for similar complaints of flank pain and vomiting on December 26, 2006 and December 29, 2006. (*Id.* at 541-45, 506-12) Plaintiff returned to the emergency room on April 29, 2007 following a seizure with complaints of headache and flank pain. (*Id.* at 487-89)

State agency consulting physician Michael Borek, D.O. ("Borek") evaluated plaintiff and her records on June 29, 2007. Borek noted that plaintiff was observed in the parking lot walking without a cane but presented to him using a cane. (*Id.* at 746) He thus found plaintiff "min[imally] credible." (*Id.*) Borek also cited negative diagnostic tests in the record. (*Id.*) Borek concluded that plaintiff had the residual functional

_____

[12]As defendant points out, LaTonn's office confirmed that LaTonn did not prescribe plaintiff the cane. (D.I. 10 at 761)

7

capacity ("RFC") to do light, non-hazardous work. (*Id.*) Borek defined plaintiff's

exertional limitations exactly as Kataria did previously. (*Id.* at 740)

LaTonn prepared a narrative report regarding plaintiff's history on November 19,

2007. LaTonn provided that plaintiff

> presents with multiple physical illnesses including, but not limited to: a history of atrophy (total non-function) of the right kidney; chronic pylonenephritis[13] with associated high fever and chills; congenital deformities of both ureters; chronic kidney disease; kidney stones; approximate 10% decrease in left kidney function with compensatory hypertrophy; dysuria[14] (severe); excessive frequent urination; and stable recurring urinary tract infection with lower back pain and fever; a history of childhood seizure. . . ; a history of rheumatoid arthritis that first was suspected/noticed at approximate[ly] 3 to 4 years of age, with current pain levels necessitating use of [a] cane to help with mobility; for several years severe pain levels in all joints, especially in [plaintiff's] neck, back, hips and knees [that has] exacerbated [her] inability to work (not even on a part time basis), and require pain management and the use of narcotics; a history of migrane with extreme pain, visual disturbance and nausea; a history of heroin addiction, completed rehab, recovered, and clean; general lack of sleep, loss of appetite and nausea associated with pain; and most recently episodes of lower extremity edema[15].

(*Id.* at 747) After detailing the nature of his treatment of plaintiff in the 1980s and 1990s

for these issues, LaTonn noted that plaintiff was in an auto accident in May 2001 that

exacerbated her arthritis pain flare-ups (which have become "uncontrollable" and

necessitated her utilizing "full time pain management care"). (*Id.* at 749) He noted that

plaintiff had a fall in September 2002 that affected her mobility further. (*Id.*) For the

"mid-2000s, [LaTonn] found an increase in [plaintiff's] infections and a return of her

seizures," noting that "her arthritic pain and kidney problems control her life completely

---

[13]Kidney infection.

[14]Painful urination.

[15]Swelling, generally due to excess fluid trapped in the body's tissues.

8

at this point." (*Id.*) After plaintiff's marriage in November 2006, she transferred from LaTonn's care to Daisy Rodriguez, M.D. ("D. Rodriguez")[16] who was closer to her new residence. (*Id.*) La Tonn concluded as follows:[17]

> [B]etween [plaintiff's] kidney problems, the return of her seizures, her arthritis and chronic pain problems, it is my opinion that it is impossible for her to hold a job of any type. I do not expect her conditions to improve, with time or medications. Throughout her many hospitalizations and consults with specialists, the diagnoses and findings concur that her disease is permanent and will become more debilitating in its advancement.

(*Id.*)

LaTonn also completed a Rheumatoid Arthritis Impairment Questionnaire dated November 26, 2007. Therein, he diagnosed rheumatoid arthritis, right kidney atrophy, seizure disorder and pyelonephritis. (*Id.* at 770) All conditions were described as "chronic," "permanent and progressive." (*Id.*) LaTonn checked-off that plaintiff experienced pain, inflammation or limitation in her neck, mid back, lower back, and both shoulders, knees, ankles, and elbows, fingers and wrists. (*Id.*) He also identified the following "positive clinical findings:" abnormal posture ("stiff"); reduced grip strength in both hands; tenderness in the back, hands and wrists; redness in the finger joints; swelling in the finger joints and ankles; joint deformity; muscle spasms in the lower back; crepitus[18] of the shoulders and knees; trigger points of the scapulae, shoulders and "SI joints;" and a positive straight leg raising test to 45 degrees bilaterally. (*Id.* at

---

[16]D. Rodriguez is a specialist in internal medicine. (D.I. 13 at 8, n.22) (citation omitted)

[17]As defendant points out, LaTonn's summary is not signed and typed in all capital letters.

[18]Generally, cracking, crinkling, grating or popping sounds and sensation.

9

771) LaTonn stated that two laboratory tests ((+) Rheumatoid and Elevated Sedimentation Rate) support his diagnoses. (*Id.*)

After describing plaintiff's primary pain symptoms as "severe"[19] and at a level of "9" out of 10, LaTonn opined that plaintiff can only sit for 6 hours in an 8-hour workday, and stand or walk for 1 hour in an 8-hour workday. (*Id.* at 772-73) Plaintiff needs to get up and move around every 15 minutes when sitting, however. (*Id.* at 773) LaTonn indicated that plaintiff can occasionally lift or carry 5 to 10 lbs. and never more, and that plaintiff's symptoms are severe enough to "frequently" interfere with attention and concentration.[20] (*Id.*) LaTonn indicated that plaintiff is capable of working in a "low stress" environment and that plaintiff needs to avoid temperature extremes, height, pushing, pulling, kneeling, bending and stooping in any employment. (*Id.* at 775) LaTonn stated that the earliest date that plaintiff experienced these severe symptoms and functional limitations was April 2002. (*Id.* at 776)

On June 14, 2007, plaintiff had a" follow-up examination" with D. Rodriguez at the Injury Rehabilitation Centers of Pennsylvania. The report states that plaintiff has "constant, moderate, mid-thoratic spine pain" rated from a 5 to 9 out of 10, as well as moderate left hip pain, which fluctuates between a 6 to 9 out of 10 on the pain scale.

---

[19]LaTonn provided that plaintiff has "severe generalized pain at all joints," "generalized fatigue," sleep disorder and swelling; with respect to the pain, LaTonn also described it as "constant achy pain" that most frequently affects the "shoulders [and] entire spine area" and that is exacerbated by cold weather, climbing stairs or bending. (D.I. 10 at 772)

[20]LaTonn said that emotional factors (such as depression and anxiety) do not contribute to the severity of plaintiff's conditions, or functional restrictions. (D.I. 10 at 773)

10

(*Id.* at 814) Plaintiff also rated her bilateral knee pain at a 7 to 9 out of 10. (*Id.*) The report notes that plaintiff was staking OxyContin for pain, Xanax, Phenobarbitol and Halcion (for sleep). (*Id.*) Upon examination, moderate tenderness was noted at the C4-C6 region of plaintiff's neck, limited forward flexion in the lower back with low back pain, spasm upon palpitation in the L2 to S1 region, moderate tenderness at T8 and L4, and from T2-S1. (*Id.* at 815) Limitations in rotation of the left hip were noted as well as severe tenderness on palpitation in the area with deep occasional pain. (*Id.*) Evaluations of plaintiff's knees revealed severe tenderness during passive flexion. (*Id.*) Finally, it was noted that plaintiff "continues to exhibit difficulty in transfers[21] and still uses both hands for this activity. Strength still is 2/5 diffusely throughout." (*Id.*)

Plaintiff was again seen by D. Rodriguez at the Injury Rehabilitation Centers of Pennsylvania on July 17, 2007. At that time, plaintiff rated her pain levels similarly to the earlier visit but now rated her baseline left hip pain at 4 to 9 out of 10. (*Id.* at 811) The report states that plaintiff's mother "assists her with dressing and moving around the house." (*Id.*) The same medications were noted. (*Id.*) As before, moderate tenderness in the C4-C6 region was found on examination, as well as the flexion and tenderness issues in plaintiff's back and knees, and difficulty transferring, although plaintiff's strength was rated as 3/5 diffusely throughout. (*Id.* at 812) The "Clinical Summary" of the report states that, within a reasonable degree of medical certainty, plaintiff has juvenile rheumatoid arthritis, degenerative disc disease (thoracolumbar),

_____

[21]While "transfer" may reference the ability to move objects from one hand to the other, the nature of the "transfers" as used in plaintiff's reports is not specifically clear from the Injury Rehabilitation Center's records.

11

and gait abnormaility, secondary to her motor vehicle accident of April 16, 2003. (*Id.* at 813) Under "Recommendations," plaintiff was instructed to revisit in August 2007, continue with Halcion, OxyContin and Xanax, and she should "refrain from squatting, kneeling, crawling, climbing, prolonged sitting or standing, and lifting greater than 5 lbs." (*Id.*) The physician categorized plaintiff's condition as "moderate," and stated that she "requires chronic pain management. The overall prognosis of the injury-related conditions is fair." (*Id.*)

Records indicate that plaintiff continued to follow up with D. Rodriguez between August and November 2007. (*Id.* at 799-811) On September 13, 2007, plaintiff rated both her baseline thoratic and shoulder pain as a 2 out of 10 with fluctuations to 4 out of 10. (*Id.* at 805) Her baseline hip pain was a 3 out of 10 with fluctuations to 9 out of 10, and her knee pain was a 4 to 5 out of 10. (*Id.*) Forward flexion of the lower back was noted as 45 degrees, rotation to 30 degrees, still with spasm between L2 to S1, "moderate" tenderness between T8 and L4 and T2 to S1 regions. (*Id.* at 797) Again, the "Restrictions" were listed as refraining from squatting, kneeling, crawling, climbing, prolonged sitting or standing, and lifting greater than 5 lbs. (*Id.*) It is also notable that plaintiff's strength was rated at a 3/5 level in August but was back to a 2/5 in September 2007 and later reports. (*Id.*)

On November 29, 2007, plaintiff was evaluated by George Rodriguez, M.D. ("G. Rodriguez"). (*Id.* at 798) The record largely mimics the previous reports. On November 29, 2007, plaintiff rated her thoratic pain at a 5 to 9 out of 10, left shoulder pain between a 6 and 8 out of 10, left hip pain at a 6 to 9 out of 10, and bilateral knee pain as 6 to 9 out of 10, fluctuating. (*Id.* at 796) The same medications were noted.

12

Forward flexion of the lower back was noted as 20 degrees, still with spasm between L2 to S1, "severe" tenderness between T8 and L4 and T2 to S1 regions. (*Id.* at 797) Left hip rotation was 30 degrees secondary to deep occasional pain, with moderate to severe tenderness in the hip and buttock, and knees during passive flexion. Strength was 2/5. (*Id.*) The same recommendations were noted by G. Rodriguez as in D. Rodriguez's July 2007 report. (*Id.*) Plaintiff continued to follow up with D. Rodriguez and G. Rodriguez through August 1, 2008; plaintiff does not call out with particularity any portions of these records in her brief. (*Id.* at 781-95; D.I. 13 at 9)

## D. Hearing Before the ALJ

As noted above, the hearing before the ALJ took place on April 1, 2008. At the outset of the hearing, the ALJ noted that plaintiff's counsel had not provided her any records from either D. or G. Rodriguez and, therefore, the last treatment records before her were from LaTonn in November 2006. (D.I. 10 at 825-27) While the ALJ ultimately referred to later records in her decision, the court notes that the following testimony was elicited without their benefit.

### 1. Plaintiff's testimony

Plaintiff testified that she turned in her driver's license in 2007 due to seizures and had not yet been cleared by a physician to have it back. (*Id.* at 829) She was a waitress and bartender in 1997, which involved standing and walking all day. Prior to that she was a gas station attendant in 1996, a waitress prior to that in 1994, and a gas station attendant in 1990-1992. (*Id.* at 830-31) She tried to work after her car accident in 2003, but could not work after 2005 due to flare-ups of arthritis and swelling. (*Id.* at

13

832) The accident made plaintiff's arthritis "ten times worse" than previously. (*Id.* at 833) She has "severe pain" in her neck, shoulders and hands, as well as her spine, hips, knees and feet, and her hands are so swollen that she cannot take off her rings, and can only write for a few minutes. (*Id.* at 833, 835) Plaintiff does not have a physician that she sees for her arthritic problems, and does not get treatment for her arthritis specifically. (*Id.* at 833) She sees D. or G. Rodriguez[22] for pain medication. (*Id.* at 835)

With respect to her limitations, plaintiff can nod with her neck but cannot turn all the way to the left side. Her neck pain occurs once a day, and she has both stiffness and spasms in the area. (*Id.* at 836) She can place her arms in front of her, but not above her head. (*Id.* at 836-37) Plaintiff's hand swelling is "permanent" as she has not gone a day without it in a long time. (*Id.* at 837) She can do manual tasks (buttons, zippers, picking up objects) but cannot bend over to tie her shoes, and stiffens quickly when eating with utensils, usually having someone pre-cut her food. (*Id.* at 837-38) Plaintiff can brush her teeth and hold a cup or bottle to drink from, and can open car doors and doorknobs. (*Id.* at 838)

The ALJ noted that plaintiff appeared at the hearing with a cane. Plaintiff said that she uses it to avoid pain from putting too much pressure on the left side of her body and that, if she does not try walking with a cane, she falls. (*Id.* at 838-39) Plaintiff testified that she started using the cane after her accident in 2003, but that it was not prescribed by a physician. (*Id.*) Plaintiff also added that without the cane, she cannot

_____

[22]As noted *infra*, the ALJ was not specific in her questions to either D. or G. Rodriguez, referencing "Dr. Rodriguez."

14

get up from the sitting position, and needs help using the toilet. (*Id.* at 844)

Plaintiff testified that her knees and feet swell 2-4 times a month for 4-5 days. (*Id.* at 839-40) She cannot take many anti-inflammatory medications due to her kidney problems, but she has tried many medications for this. (*Id.* at 840) With pain medication, her baseline pain is between a 4 and 5 out of 10, without it, "it goes straight to a 9." (*Id.* at 840-41)

Plaintiff confirmed having petite mal seizures after her 2003 accident and eventually grand mal seizures, and takes alprazolam (benzodiazepine) for her seizures.[23] (*Id.* at 841) She stated that her seizures occur about once a month, but that the last seizure she had was several months before the hearing. (*Id.* at 841-42) Since 2006, plaintiff treated only once for her kidney problems, at the hospital when she had a kidney stone; there has been no regular treatment, and plaintiff denied having kidney problems on a daily basis. (*Id.* at 843-44) She also denied having negative side effects from medication on the average day, aside from getting tired for about an hour mid-day. (*Id.* at 844)

Plaintiff testified that she can walk for several minutes, albeit slowly, can stand for minutes, and can sit for about 45 minutes before needing to stretch or stand up. (*Id.* at 844-45) She lives in a split-level home and sleeps on the couch on the bottom floor. (*Id.*) She reports being able to lift 5 pounds. (*Id.* at 845) She cannot bend forward at the waist or kneel down, but has no significant problems with concentration. (*Id.* at 846) Plaintiff has trouble sleeping, but gets about 6 hours of sleep with medication. (*Id.* at

---

[23]Plaintiff stated that she was recently switched from Phenobarbital, a barbituate, a few months before the hearing.

15

847) She needs assistance dressing (getting tops on and off with arms raised) and drying after bathing (reaching her back, legs and feet). (*Id.*) Plaintiff reports that her husband does the cooking, cleaning, laundry, and grocery shopping, but that she can make simple meals and use the microwave. (*Id.* at 847-48) On a "good day," plaintiff can possibly make her bed, but cannot bend over to change the sheets. She reports socializing only rarely. (*Id.* at 848) Plaintiff's husband takes care of the finances. (*Id.* at 850) On a typical day, plaintiff makes herself a cup of tea in the morning in the microwave, and watches TV for most of the day. (*Id.* at 850-51)

## 2. Vocational expert testimony

The hypothetical question asked by the ALJ is as follows:

[I]f we consider a hypothetical person who is about the claimant's stated age at onset, as 30, at date of application, as 32 years. This individual has a twelfth grade education and work history that you just talked about. There are certain underlying impairments that place limitations on the ability to do work related activities. In this hypothetical, we'll start at a light level of exertion, posturals all occasional, but never climbing a ladder, rope or scaffold, pushing and pulling with the upper extremities would be frequent rather than constant, reaching overhead. I should say working overhead, reaching overhead, handling, fingering, feeling would all be frequent rather than constant. Environmentally, this person should avoid concentrated exposure to extremities and cold, and vibration, should not have any exposure at all to hazards which are defined as heights, and moving machinery.

(*Id.* at 853-54) With these limitations, it was the VE's opinion that such a person would not be able to do any of plaintiff's past relevant work. However, there would be the following simple, unskilled positions at the light exertional level that such a person could do with these restrictions in the national and regional economies: (1) a photocopy machine operator; (2) a collator; and (3) a mailroom clerk. (*Id.* at 854) The VE also testified that, if the individual ambulates holding a cane, this would affect her opinion

16

"very minimally," or less than 5% erosion, as these jobs are performed in a seated position. (*Id.* 855) On cross-examination by plaintiff's attorney, the VE stated that swelling of the fingers impacting fine motor skills, as indicated in the Rheumatoid Arthritis Impairment Questionnaire by LaTonn dated November 26, 2007, would "certainly impede" this type of employment. (*Id.* at 856-57)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual

17

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520.

18

The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the RFC to perform his past work. If the claimant cannot perform his past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the

19

case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. The ALJ's Decision

The ALJ considered the medical evidence of record and testimony received at

the hearing, and concluded[24] that plaintiff retains the capacity for work and is not

disabled as defined by the Social Security Act. The ALJ made the following

enumerated findings.

1. The claimant has not engaged in substantial gainful activity since April 10, 2006, the application date (20 C.F.R. 416.920(b) and 416.971 et seq.).

2. The claimant has the following severe impairments: recurrent pyelonephritis of the left kidney, atrophy of the right kidney, depression, anxiety, inflammatory arthritis and seizures (20 C.F.R. 404.1520(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform simple, unskilled, sedentary work as defined in 20 C.F.R. 404.1567(a) except that she could lift 20 pounds occasionally, 10 pounds frequently, sit for 6 hours in an 8 hour period, stand or walk for 2 hours in an 8 hour period, occasionally balancing, stooping, kneeling, crouching and crawling but never climbing a ladder, rope or scaffold, frequently pushing and pulling with the upper extremities, working overhead, handling, fingering and feeling, avoiding concentrated exposure to extreme cold and vibrations and all exposure to heights and hazardous machinery.

5. The claimant is unable to perform any past relevant work (20 C.F.R. 416.965).

6. The claimant was born on August 12, 1973 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 416.964).

7. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 416.964).

_____

[24]In a 17-page, single-spaced opinion.

20

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabiled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 416.960(c) and 416.966).

(D.I. 10 at 19-32)

### C. Analysis

Plaintiff argues that the ALJ failed to follow the treating physician rule, that is, that the ALJ relied upon only selected findings from LaTonn and the non-examining sources in determining that plaintiff could perform sedentary work, without explaining how only those findings were supported by substantial evidence. (D.I. 13 at 12-16) Specifically, the ALJ assigned weight to LaTonn's opinions that: (1) plaintiff can work in a low stress environment; (2) sit for 6 hours in an 8 hour period; (3) lift up to 10 pounds; and (4) avoid excess temperatures. (D.I. 10 at 30) She found the remainder of LaTonn's opinions to be inconsistent with the record and his own treatment notes, because: (1) LaTonn, who is not a urologist or rheumatologist, relied heavily on plaintiff's subjective complaints to guide the completion of his opinion; and (2) he had not treated plaintiff since a year prior to rendering his opinion; and, therefore (3) his opinion was based on his limited treatment notes and memory. (Id. at 31) While defendant is correct that the opinion of a specialist is given greater weight than that of a nonspecialist, 20 C.F.R. § 416.927(d)(5), LaTonn was the treating physician and, as such, his opinion was to be given great weight if it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

21

evidence in [plaintiff's] case record[.]" *See Russo v. Astrue*, Civ. No. 10-2772, 2011 WL 1289132, *5 (3d Cir. Apr. 26, 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

Plaintiff correctly argues that an ALJ is not permitted to "cherry-pick" only that evidence that supports her position. (*Id.* at 13-14) *See Mason v. Astrue*, Civ. No. 08-1388, 2010 WL 779500, *8 (S.D. Ind. Mar. 1, 2010) (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 917-18 (7th Cir. 2003)); *see also Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (ALJ erred in drawing his own medical conclusion "based solely on a credibility determination and the pieces of the examination reports that supported this determination"). In this regard, plaintiff points out that, despite the flaws assessed to LaTonn's methodology, certain of LaTonn's restrictions were adopted by the ALJ. Specifically, the ALJ agreed with LaTonn that plaintiff can sit for 6 hours, lift up to 10 pounds, and work in a low stress environment. (D.I. 10 at 30) Other restrictions, such as "no" pushing, pulling, kneeling, bending or stooping (D.I. 10 at 775), were rejected without specific explanation. (D.I. 13 at 15-16)

The court notes that the ALJ did not specifically mention that LaTonn's opinion that plaintiff could sit for 6 hours per day was a maximum duration, with a requirement for breaks to stand or walk every fifteen minutes, and that the total standing and walking could not exceed one[25] hour per day. (D.I. 10 at 773) Even though the ALJ adopted LaTonn's restriction that plaintiff can sit for 6 hours, the question to the VE did not specifically provide a 6-hour maximum for sitting, and simply provided that "posturals

---

[25]LaTonn first circled two hours of standing or walking per day (which, combined with six hours of sitting, yields an eight-hour workday), but crossed that out and circled one hour standing or walking per day. (D.I. 10 at 773)

[are] all occasional" without respect to breaks to stand. (*Id.* at 853-54) *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) ("[T]he ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations"). Similarly, while the ALJ credited LaTonn's assessment that plaintiff can "lift up to 10 pounds" (D.I. 10 at 30), she did not mention that LaTonn opined that plaintiff can only "occasionally" lift this weight (*id.* at 774), nor was the VE given these parameters (*id.* at 853-54).

Plaintiff also takes issue with the ALJ's comment that LaTonn "relied heavily" on plaintiff's subjective complaints, insofar as LaTonn reported that his opinion was based on clinical and diagnostic findings, including tenderness, swelling, crepitus, trigger points, and blood tests documenting a positive rheumatoid factor and elevated sedimentation rate. (D.I. 13 at 15) (citing D.I. 10 at 771) The court agrees that LaTonn indicated on the cited page of the Rheumatoid Arthritis Questionnaire several "positive clinical findings" that support his opinions. (D.I. 10 at 771) While plaintiff does not separately cite the clinical data in the record,[26] it cannot be said that LaTonn had no objectively verifiable evidence upon which to base his conclusion. (*Cf.* D.I. 18 at 15-16)

In its combined moving and opposition papers, defendant focuses on plaintiff's lack of credibility, "including but not limited to her claim of being prescribed a cane, which was specifically denied by her physician," having testified that she can hardly walk without it, and having been observed in the parking lot walking while holding the cane. (*Id.* at 13-14) (citing D.I. 10 at 27-29, 88, 438, 746, 833) As another example, when asked at the hearing, plaintiff did offer an explanation for her disability date of

_____

[26]For example, it is not clear that the laboratory test results relied on by LaTonn are of record.

March 28, 2006 (D.I. 10 at 832), and she acknowledged working from September 2006 to December 2006 (*id.* at 779). Defendant argues, correctly, that an ALJ is not required to accept a claimant's testimony uncritically, and that subjective complaints, alone, cannot prove disability. *See* 20 C.F.R. § 416.929(a); *Schmidt v. Commissioner of Social Sec.*, Civ. A. No. 11-2499, 2012 WL 593276, *3 (3d Cir. Feb. 24, 2012). With respect to the ALJ's determination to discredit certain of LaTonn's conclusions, however, defendant simply reasons that "[g]iven plaintiff's diminished credibility, the lack of specialized treatment, the benign objective medical evidence of record, and the opinions of state agency physician consultants, the ALJ reasonably concluded that plaintiff could perform a wide range of sedentary work." (D.I. 18 at 13-18)

Of the three reasons given by the ALJ for discounting LaTonn's opinion as plaintiff's treating physician, only one is supported by the record: plaintiff does not contest that LaTonn had not treated her for a year prior to his completion of the Rheumatoid Arthritis Questionnaire. There are no specific reasons given for discounting LaTonn's additional restrictions, several of which were included in the question posed to the VE (e.g., "frequent" pushing and pulling). Notwithstanding, the hypothetical question to the VE did not reflect all of plaintiff's impairments that were accepted by the ALJ as supported by the record. *See Rutherford*, 399 F.3d at 554. The VE testified that an individual as described by LaTonn in his questionnaire would not be able to perform any work. (D.I. 10 at 856-87)

In sum, the court remands for reconsideration of the proper weight to be afforded LaTonn's opinion as the treating physician; for more particularized explanation, where appropriate, of why certain limitations are deemed incredible; and the solicitation of

24

vocational testimony responsive to an appropriate hypothetical question. Because the court remands on these grounds, the court will not consider plaintiff's additional arguments, for example, that the ALJ erred in discounting D. and/or G. Rodriguez's opinions.[27]

## V. CONCLUSION

For the reasons discussed above, the court remands the case for further proceedings consistent with this memorandum opinion. Plaintiff's motion for summary judgment, therefore, is granted and defendant's motion for summary judgment is denied. An appropriate order shall issue.

---

[27]The ALJ assigned "little weight to Dr. Rodriguez's opinion" because the treatment notes indicate that plaintiff's pain measurements and functional ability fluctuated over time, yet the doctors' ultimate conclusion about plaintiff's ability to work did not change. (D.I. 10 at 31) Thus, the "static nature" of the opinions "did not reflect the true state of the claimant's functional status." (Id.)